Good morning, Your Honors. May it please the Court, my name is Al Broussants. I'm appearing on behalf of Mrs. Tyrone Beverly in the Law Offices of Barry Levinson in this appeal. When I got into this case and doing a reply brief, I had a mystery to solve. The mystery to solve was, in reviewing the District Court's decision, why there was no legal analysis in interpreting the facts that were presented in the motions for summary judgment. And in reading the decision of the District Court, I noted that the Court weighed the credibility of the deposition testimony of all the parties and chose to believe the moving party, namely Costco and their version of the facts. In so doing, it invaded the province of the ultimate fact finder, the jury, in this case. There was a couple of sentences in that decision that also puzzled me, where the Court pointed out that there was no direct evidence of discrimination. There was no case law cited. But very rarely is there any direct evidence of discrimination, very rarely. Employers have gotten more sophisticated than that. So what we rely on is the McDonnell-Douglas three-part analysis proving the Prima Fascia case, the employer then presenting evidence and presenting a nondiscriminatory reason, and the plaintiff at that point presenting some evidence or argument indicating to the Court that the reasons were pretextual. Let me tell you what the problem I have with your case. Who's Tom Berba? Tom Berba is an individual who had – he's the general manager of the Summerlin Warehouse. He's the individual that worked with Mr. Beverly at the time that Mr. Beverly was promoted to the floor supervisor's position at the Henderson. Berba promoted Beverly in 98 to a supervisory position. He did. And Berba promoted Beverly in September 2001 to assistant front-end manager. He did. He twice promoted him. I had a case like this some time ago, Bradley v. Harcourt Grace, and pretty much it says if somebody has hired you or has promoted you, it's awfully hard after that to say that when he fires you, it's because you were either African American or whatever. Because if he had those kinds of problems, he'd have never hired you in the first place. And here Berba is the one who investigated all the complaints of inappropriate behavior with females. He's the one that made the decision to terminate. And so, I mean, it just doesn't fit. And that's why the district court was looking at the facts here to see whether it was enough to create a genuine issue. What a judge does is he looks down the road, takes a look at the facts, and says if a jury were to come back with this verdict, would I support it? And the answer here is no, because Berba seems to be this guy's supporter until all these complaints start coming in of inappropriate behavior with females. Then what we're doing is we're assuming certain facts were not in evidence with the court. Well, I understand Berba promoted him twice. Yes, but however the motivation for those promotions is not explored. The human factor, the motivation for hiring people, firing people, may or may not have anything to do with race. There are numeral anecdotal evidences of individuals being hired because they are a token minority. Whether this happened initially, I do not know because that was not presented to the district court. But to assume that an individual hires a minority means that he does not harbor any animus or discriminatory purpose would be to forget that people are hired for what numerous case law shows is reverse discrimination, that they are hired because they are a minority. That is just a racial animus, just as discriminating against somebody who is hiring. Where's the evidence of that? There isn't. There is no evidence either that Berba ever even made a stray comment of the kind you read in these cases. That's right. And there is no evidence that he hired him because he was not a minority or that he hired him because he was a minority. There's no evidence on that. So for Your Honor to take the case. That sounds like the argument that, you know, somebody says, this is a conspiracy. And somebody says, there's no evidence that it was a conspiracy. And somebody says, well, there's no evidence that it wasn't a conspiracy. I mean, we're in the fog, and that's what the district court said here. And we have to build the blocks. And the blocks that we have to build is we have to take a look at the entire case and the entire situation. Is it true that Berba can convene this process after receiving written complaints about your client's behavior regarding women? It is true. But the facts that puzzled me in this case is let's take the failure to promote him in the Henderson warehouse to a bakery manager position. There's complaints, complaints from white females to the warehouse manager in Henderson. The warehouse manager in Henderson asks Mr. Beverly's statement of facts and does an investigation. The result of that investigation is that these three white females in the bakery department deliberately undermined Mr. Beverly's authority. And there is testimony to that effect that Mr. Sneersick, who's the manager in the Henderson warehouse, actually says that they were either doing a work slowdown or actually state that they just did not follow the shift. And yet he testifies that he didn't consider that insubordination. Insubordination is a grounds for terminating an individual in the Costco's employment policy. These three women, these three white females that refused to work quickly, refused to show up for a change in shift, are not insubordinate yet and they don't get punished, they don't get disciplined. What happens is Mr. Beverly is told you better be a better manager so we're going to have you, we're going to have you take some courses. When Mr. Beverly applies for the bakery manager position, one of the ostensible reasons for not promoting him to a bakery management is because of his perceived problems with the three employees that were not disciplined. That raises a question of pretext at that point in the case. Pretext is also raised when — That's to the promotion. That's to the promotion. But if we take up the entire both determination and promotion as to what happened, there are several issues of pretext. Your Honor mentioned conspiracy. Somebody says there's no conspiracy, there's a conspiracy. I looked at this and I said, you know, this looked like they were gunning for him. For example, there's a deposition of Linda Patterson that at page 463 of the record on appeal, he is — Mr. Beverly tells this individual in the customer service department while he's working at the bakery, listen, if there's any complaints about baked goods, refer him to the bakery. We can take care of that situation there. It is totally contrary to Costco's then policies about handling complaints. This lady, Linda Patterson, complains, thinks, oh, my God, he's having me do things that nobody else has asked me to do in 13 years. Actually, that's what her deposition said. And she started complaining about him. Her quote, the quote was, because Mr. Beverly had asked me in the future if there was a product that a customer had a problem with to take it to the bakery instead of taking it to the office. Sammy, who's a supervisor, who's a manager in the warehouse in Henderson, walks by, overhears it, and then Ms. Patterson testifies at page 464 of the record that a month and a half later he calls her into the office and asks if he, if she has a complaint against Mr. Beverly. And she's basically said that it was too far to walk back to the bakery and that was an inconvenience. At that point, she is asked to sign a document that Beverly had acted in conduct unbecoming a supervisor or a manager. So now we have a situation where while he's working at the bakery, he's got interrelations with other employees. He is then suggesting a procedure that ironically Ms. Patterson testifies later on at page 511 on the record that Costco implements for a year afterwards, that bakery complaints go to the bakery. At that point, there are supervisors looking to find complaints against him. That raises an inference of a conspiracy, so to speak, that raises a question of what is actually going on there. The fact that the white females are not disciplined raises a question of why not. And then the puzzling matter with this Burba situation is that Mr. Beverly, who is such a terrible employee that he couldn't be a bakery manager, once he goes back to his position as a floor supervisor, winds up getting promoted as an assistant floor supervisor. Ironically, only after he makes a complaint to the Nevada Equal Rights Commission, a complaint that the individual, Mr. Burba, that promoted him was very well aware of at the time of promotion. What does that raise? Does that raise an inference that he was hired because he was an excellent employee when he's being fired because he's not an excellent employee? Or does that raise an inference that Mr. Burba decides to promote him solely because he made an equal rights complaint? That is something that is for the jury to decide as to the motivation for Mr. Burba's hiring. We also have a situation where his termination follows after he receives a right to sue letter from the EEOC. I've done some employment law over the years, particularly workman's comp. And strangely enough, Nevada has a public policy that you can't fire anybody while they're making a worker's comp claim or firing them for making a worker's comp claim. Ironically and strangely enough, after the claim is closed, people get terminated. And there's always a justification. You weren't a good employee. You were late. We have complaints. So let's look at the complaints and the reasons for the termination. The reasons for the termination include a plethora of reasons. But the best description I can have of them is they were old news. For example, Ms. Cawley, who's the assistant supervisor in the Summerlin Warehouse, testifies that after she told Beverly, don't be touching or hugging or kissing employees. Somebody may interpret it as sexual harassment. There is no report that he did so. Another employee, Angela Buckheimer, who's used as a complainant, who's asked early on in September, almost a couple of months after Mr. Beverly is promoted to the Summerlin Warehouse, she says that he's riding me hard. He's giving me a hard time. When she is reinterviewed prior to the decision is made to terminate him, she says, things are fine. It's improved. I guess he realizes I can do my job. Yet these are the things that are being used against him to terminate him after he gets his right to sue letter. Now, granted, each separate occasion, each separate incident by itself might not raise the inference that the whole thing was a pretext. But if we look at the totality, if we look at the progression, if we look at the circumstances, they're saying that they fired an individual who they had promoted because earlier on they refused to promote him because he was not worthy of a promotion. Makes no sense. The justification makes no sense. In addition to the failure to get the bakery job, Mr. Gregory, I'm sorry, Mr. Beverly, did also not get any of the open management positions that were open when he was moved to the bakery. And that raised a question because the individuals that were promoted during the same time period held the identical position that Mr. Beverly held before he moved to the bakery. They were floor supervisors, floor supervisors that were younger than him, that were white. After working as floor supervisors for two years, were promoted to other higher management positions while Mr. Beverly was in the bakery. Did he ever express any interest in moving from the bakery management kind of position that he had to one of these other available positions? I'm not talking about even a formal application. Did he just say, hey, if something else comes up, I might be interested in it? Mr. Beverly testified that when he spoke initially to Mr. Sneerzyk, who was the Henderson manager, he was a floor supervisor at the time, and he expressed an interest to take any management position. And at that point, Mr. Sneerzyk said, well, that's the only thing I can think of is the bakery manager has expressed an interest in moving out of state, so that's a position that's going to be open. Why don't you take the assistant lead? My question, though, was while he was in that position at the bakery, did he ever go to the manager and say, if anything else opens up in the story, I'd like to be considered for it? I'm not talking about a formal written application or anything. Mr. Sneerzyk recalls two events where Mr. Beverly applied informally. Other positions that were open, he doesn't recall if they did. Mr. Beverly just says, I told him, I'll take any position in management. So there's a question of it was the record, at least at the depositions, that part was missing. That's why I initially started out. I said I had a mystery to solve why all this happened and why this was all done. But what was interesting is what the district court did with that evidence. The district court looked at the shuffling of the managers and did not recognize that the managers that were shuffled came from the positions that Mr. Beverly held before going to the bakery at about the time he was moved to the bakery and were giving to younger white males. As a matter of fact, one individual, Mr. Ken Yesh, Mr. Beverly testifies in his deposition that there was a sexual discrimination claim made against Ken Yesh, yet Mr. Ken Yesh got to stay in the company and was moved to a different location. This same individual was a floor supervisor as Mr. Beverly for two years, was promoted to a membership management position while Mr. Beverly was in the bakery. And the best that Mr. Smearzy could explain, why didn't he offer him that position, was that, well, he was in the bakery. He was moving on track in that direction. That's not what Mr. Beverly testified to. He testified, give me any position that's open. The positions that are open he doesn't get, even though at that point he would have been qualified for those. I'd like to reserve additional time. Thank you. Thank you. Good morning. Please support. My name is Stacy Sharton. I'm with Cypress Shaw in Los Angeles, and I represent Costco Wholesale Corporation. With the Court's permission, I'd like to start with some brief general comments to place this case in a proper legal and factual context. The Ninth Circuit, of course, has been very aggressive in recognizing and protecting the rights of employees to be free from unlawful discrimination, harassment, and retaliation in the workplace. For example, in McGinnis v. GTE Services, Judge Paez wrote an opinion joined by Judge Reinhart that overturned summary judgment on discrimination and harassment claims, where the plaintiff presented evidence that he was subjected to a racially hostile work environment over the course of 15 years, which included the most vile racial epithets. It included subjecting him to safety problems. It included not paying him pay that was available to non-African American similarly situated employees. It included racial graffiti. And the same laudable goal was invoked in the case of El-Hakim v. BDY, in which Judge Nelson participated, and in which the Court found that a defendant's CEO, who persisted in calling an Arabic employee Manny when he wanted to be called by his proper name, Mamdouh, was subjecting that individual to discrimination. Costco could not agree more with the worthy goal that these cases represent. That's why it has a policy against harassment in the workplace on any unlawful basis, and why it has a procedure in place to give employees who believe they've had problems in the workplace the right to complain and the right to get those problems corrected. However, this case is not the McGinnis case. This case is not the El-Hakim case, nor is it the Rod case, which plaintiffs' counsel cites repeatedly in their answering brief. Not by a long shot, Your Honors. First and foremost, because in contrast to all of these cases, the sum and substance of Mr. Beverly's evidence, and I use that word in quotes, that race played any part whatsoever in the employment decisions he challenges are just four comments made over the course of his nine years of employment at Costco. And the Court, of course, knows these from the record, but I'll just briefly summarize them. The first was prior to 1996, so literally six years before he was terminated from his job, one former supervisor in the Juneau, Alaska store made a comment about cleanup work being appropriate for African-American employees. Not a good comment, completely inappropriate, but something that was old business and that Mr. Beverly did not complain about through the procedure at Costco. The second? Were any showing of any nexus to that, to the decision? Absolutely not, Your Honor. The next comment was sometime between 1996 and 1999, taking Mr. Beverly's testimony at face value, when another supervisor made some negative comment about the father of Serena and Venus Williams. Mr. Beverly did not even recall what that comment was. He recalled it was offensive, but he never reported it to the company, and there is no evidence of any nexus between that comment and the adverse employment actions with which Mr. Beverly complains in this case. And then the third comment by Angela Thibodeau, who was the bakery manager when he was the supervisor. She happened to be married to an African-American gentleman at the time. She made the comment, Mr. Beverly claimed, that African-American men hit on her all the time. No nexus to any adverse employment decision. Ms. Thibodeau was not involved in any of those decisions, and another stray comment. Finally, Mr. Beverly claimed that Mr. Burba said to him one time that another African-American manager, Lonnie Abernathy, had introduced Mr. Burba to his African-American friends as a brother. B-R-O-T-H-A was the way it was spelled in the record. Again, no complaint about that. No nexus between that comment, that off-the-cuff comment, which I'm sure was intended in a friendly way and was intended as a facetious comment, because Mr. Burba is not African-American. And that's the sum and substance of any evidence regarding any race discrimination or racial comments in the workplace at Costco between Juneau, Alaska, Henderson, Nevada, Las Vegas, Nevada, and Summerlin, Nevada, over the course of nine years. More importantly, there is absolutely no evidence of any comments by the two evildoers in this case, that is, Mr. Snyzik, it's actually pronounced Snyzik, Ted Snyzik, and Mr. Burba. Mr. Beverly himself admitted that neither of these gentlemen ever made any offensive statements to him. Didn't Mr. Beverly also say he didn't regard Mr. Burba as a racist? He said that point-blank, Your Honor, that he did not regard Mr. Burba as a racist at all. Mr. Beverly also admitted, and this is significant in light of the Bradley case and then the subsequent opinion of the Court in the Coughlin case, C-O-G-H-L-A-N, of which I provided a copy to the Court and I need to provide a copy to the Coughlin. Mr. Beverly admitted that neither Mr. Snyzik, or that both Mr. Snyzik and Mr. Burba actually took positive actions on his behalf, on the job, before they took the allegedly negative actions with respect to his employment that he's complaining about in this case. To listen to Counsel, it's really mind-boggling. Counsel had a mystery to solve. He solved it with a fiction. Plaintiff's argument here is that everything positive that happened to him at the company was because the company was trying to cover up something negative. He was promoted as a token, and then he was promoted in spite of the complaint to the EEOC that he made in February of 2001. And yet, he was not promoted because he's African American, and he was terminated because he made the complaint to the EEOC. So it makes absolutely no sense, and there's no evidence making any causal connection between those events or Mr. Beverly's race or age and the adverse employment actions. The specific actions that Mr. Burba and Mr. Snyzik took that were positive toward Mr. Beverly and that the Court already has mentioned, Mr. Burba was the first manager to promote Mr. Beverly, and that was in 1998, promoted him to a supervisor position. Mr. Burba hired Mr. Beverly at the Summerlin store as the general manager in September of 2001. He promoted Mr. Beverly while he was at the – actually, at the time that he hired him, he promoted him to an assistant front-end manager position, a higher position than Mr. Beverly had held at any time before at Costco. So there's no dispute that Mr. Burba engaged in positive employment action with respect to Mr. Beverly. Mr. Snyzik also, in offering Mr. Beverly the bakery supervisor position, was also taking positive action toward Mr. Beverly. As the Court in questioning counsel pointed out, Mr. Beverly requested a managerial position. He wanted to advance, and Mr. Burba and Mr. Snyzik testified that they respected that. So Mr. Snyzik approached Mr. Beverly and said, you know, there's a position in the bakery, bakery supervisor position, yes, for the moment it is a lateral move for you, but it puts you on another career path, and Angela Thibodeau is imminently leaving the company, so you've got a chance to go through that, on that career path, and make more money faster than you'd make on the career path you're on now. Mr. Beverly accepted the job. He's a grown-up. He looked into the job. He decided, yes, this is something I want. He took that job in about April or May of 2005. That was something positive. Then we have the problems coming up with the other employees, the problems that Mr. Beverly had in every supervisory position that he had, but which somehow were the fault of the three white females, or the two white females, or the one white manager later on, even though race was never mentioned and age was never mentioned in any of those situations. But to get back to my point, and I do have a point, it is that these positive actions by Mr. Snyzik and by Mr. Berba raised the same actor defense that was in the Bradley case to which Judge Trott referred. And as this Court plainly stated in Coghlan, which cites the Bradley case with approval, when this defense applies, when the same actor, that is, the same managers who took positive action are accused of discriminating or retaliating against the individual, as the Court said, a plaintiff must make, quote, an extraordinarily strong showing of discrimination, close quote, or retaliation, which is also involved in Coghlan's case, in order to defeat summary judgment. And, of course, retaliation was involved in the McGinnis case that Judge Pius wrote the opinion in. In this case, there is no evidence of race discrimination. There certainly is not even the specific and strong evidence that the Court generally requires to beat summary judgment. There is, by no stretch of the imagination, the extraordinarily strong showing of discrimination that the Coghlan case and the Bradley case require. I already went through the ---- The complaints regarding the promotional opportunities that occurred while he was the bakery supervisor. Right. Is there anything in the record that shows that he even said, you know, not even a formal application, but, you know, if something comes up while I'm in the supervisory position, I'd like to be considered for it. Absolutely not, Your Honor. When he accepted that job, Mr. Beverly's testimony was that Mr. Snizek said, Mr. Beverly, or Greg, as he was called, you need to make a commitment here, because this is a job that you need to learn, and you need to make a commitment in order to go up that path. Mr. Beverly accepted that. He did not, in taking that job, say, I'll take it for a while, but if something else comes up, please consider me for that. He did not say, while he was in that job, please consider me for one of these other jobs that open up in the front end or in the other aspects of the store. And, in fact, those jobs, according to the record, came up almost immediately after he went into the bakery job, in the June time frame, June-July time frame. So he was well ensconced in that position. At that point, he was performing adequately in that position. There was no reason to move him to those other positions. And, Your Honor, in addition, segwaying into a slightly different point, there's no evidence that the employees who got those positions were any less qualified than Mr. Beverly for them or that he had better qualifications for that job in any objective sense. Those were rational, reasonable, non-discriminatory decisions made based upon the group of candidates for those jobs. Mr. Beverly, having accepted the bakery lead position and not indicated a desire to go into another job, was just not in that pool of applicants, if you will, or in that pool of employees and supervisors to be considered for the promotion. But it doesn't seem to have been a formal, and this point is not made in your brief, but it doesn't seem to have been a real formal application process for these managerial positions. That is correct. It was not a formal posting process or a formal bidding process that was handled. It was handled informally. That is correct. But there is no indication in the record that the selection of the individuals who were selected for the two, actually the two managerial positions that came up, was a pretext for race. Actually, I guess the argument of Mr. Beverly is that moving him into the bakery lead position somehow was part of this conspiracy to get him out of the way so that we could promote all these white people. There is nothing in the evidence to suggest that, nothing in the evidence whatsoever. Mr. Beverly accepted the job. He obviously saw it as positive. With respect to the promotion to the bakery manager position, it really was unclear to me from the briefs whether that's an issue that Mr. Beverly is pursuing, but I think it was brought up in the answering brief. So let me just, if I may say briefly, that there were numerous legitimate nondiscriminatory reasons for kicking Ms. Spada over Mr. Beverly. She worked for Costco longer, four years. She'd been a supervisor or manager six years longer than Mr. Beverly. She'd been a bakery department supervisor longer than he had. She was highly recommended by her supervisor or her manager in the bakery department. She was interviewed by Mr. Martineau, an experienced manager in the bakery area. Mr. Martineau also had worked alongside Mr. Beverly, so he knew that his work capabilities were not as great as Ms. Spada or Ms. Asmus. Clearly, tremendous legitimate nondiscriminatory reasons. Absolutely no evidence that race or age played any part in that decision. Just one point with respect to the problems Mr. Beverly had in the bakery department before that decision was made. Counsel talked about that a lot and the three white females who complained. The fact of the matter is there were complaints received from individuals in the department, just as there always were complaints by any subordinates of Mr. Beverly throughout his employment. Anyway, when the company received those, Mr. Beverly not once, not once, claimed that any of those complaints by his subordinates were based on race. He never claimed that to the company. He did ask Mr. Snizek to conduct an investigation. Mr. Snizek did that. Mr. Snizek decided that it was lame enough to go around for all the parties. So he said to the three individuals, you obey Mr. Beverly as your supervisor. And he said to Mr. Beverly, you do a better job getting along with your subordinates, so I'm going to give you the opportunity to go to company-paid training to get better with your subordinates, and I'm telling you employees on non-certain terms, you are going to respect Mr. Beverly as your supervisor when he gets done. So that was a reasonable action. There's nothing like no discipline for insubordination or anything that counsel tried to allude to here. I think I've already covered the second point in response to Judge Paez's questions regarding the promotions in the other areas. Unless the Court has more questions, I'll move on to the termination. And basically there again we have the same actor, Mr. Berba. Mr. Berba promoted Mr. Beverly in 1998. He promoted him in 2001. He hired him in 2001. There is no dispute in the record that these female employees came forward with written complaints about Mr. Beverly yet again, that Mr. Berba talked to all of them, that Mr. Berba obtained from them statements that they endorsed, and that he included in those statements exculpatory comments about Mr. Beverly as well as comments that gave him responsibility for violating company policy. He followed the procedure in providing all of that information to the appropriate decision-makers. A meeting was convened of the appropriate decision-makers regarding the decision, and Mr. Berba was authorized to go ahead and terminate Mr. Beverly as a result of that information that he obtained. This is consistent with the company's employee agreement, which deals with the alleged breach of contract. There's no evidence that it was based upon race, so that deals with the race discrimination claim and the Section 1981 claim, nor is there any evidence that it was based upon the EEOC complaint that Mr. Beverly had filed more than a year earlier in February of 2001. And there also we have the intervening positive actions that Mr. Berba took on behalf of Mr. Beverly that further defeats any causal connection or any nexus between that EEOC complaint and the termination decision. In the McGinnis case, as Judge Pius noted there, it was a year and a half after the charge or the protected action, and the court there said that that was enough to not essentially defeat, but there was no inference that there was any causal connection there as a result of it. That's almost exactly the chronology here. So finally, Your Honor, Costco wanted me to say for the record that it respects Mr. Beverly. It appreciates his contribution to the company during the time that he worked there. We're not saying that he was useless or worthless by any stretch of the imagination, but we do adamantly deny that we ever discriminated or retaliated against Mr. Beverly or that he was harassed on the job. And it's clear from the record that he failed to raise a triable issue of material fact that Costco ever did any of these wrongful things. So we respectfully request that this Court affirm the summary judgment granted below. Unless the Court has any questions, that completes my presentation. Thank you very much. Thank you, Your Honor. The individuals that took the positions of management while Mr. Berber was in the bakery were white. They were all young men. Mr. Snezek testified that, and specifically at the record at page 604, he's asked about the position taken of a front-end manager. And he mentions that the front-end manager's position was taken by an Eric Howart. That Howart managing position, he had been an assistant front-end manager for about six months. He was not African-American but got promoted. His position was taken by Jeff Hodges, who had been a front-end supervisor, who was promoted, and who was also Caucasian in 30. In response to the question, was there any reason why Greg was not considered for the assistant front-end manager position in the fall of 2000, Mr. Snezek testifies, Greg was in the bakery at that time pursuing his path. Counsel was correct in stating that Mr. Snezek, in discussing the position in a bakery, was looking towards a three-year commitment from Mr. Beverly. However, Mr. Beverly specifically testified that he advised Mr. Snezek that he was interested in any upcoming management position, was told that this was the only one available, and strangely enough, all these managers get shifted after he goes to the bakery. We don't have direct evidence. We don't have a smoking gun, and this is primarily circumstantial. It's an explanation that should be given to the jury. It's an explanation as to why has this happenstance occurred. Mr. Beverly also testified that he had conversations with a Mr. Roy Peterson, who was an assistant warehouse manager. That individual told him that there were no African Americans as managers. In response to that conversation with Mr. Peterson, he said he wanted to be the first one. So we have at least some evidence in the record that as far as Costco was concerned, at that point when Mr. Beverly was seeking a management position, they had no African Americans as managers, that he expressed an interest to take the management position, that he's given a lateral move, and during the lateral move, these positions open up, who happen to be filled by white individuals, white males, and then after he makes a discrimination claim, he gets promoted. After he gets a right to sue letter, he gets fired. Time's up. Thank you. Thank you very much.
judges: Trott, T.G. Nelson, Paez